07-1471 Mumford & Miller Concrete v. Secretary of the Army I am William Walser. I represent the appellants of Mumford & Miller Concrete v. Common, Inc. In this matter, Mumford & Miller's appeal is based on two decisions made by the Armed Services Board of Contract Appeals and the two decisions relating to two separate documents. The first decision by the Board is relating to the Board's denial of Mumford & Miller's claim relating to the government's directive to remove and re-drive sheet piles of existing steel bulkhead. The other claim, the other decision by the Board, relates to the Board's denial of Mumford & Miller's claim relating to the government's directive to suspend work on the project. I will first address the Board's decision to deny Mumford & Miller's claim relating to the removal and re-drive of those sheet piles. They're really essentially the same, aren't they? It's hard for me to see how you could, for example, win on one and lose on the other, right? Aren't they predicated on the same analysis by the Board, which you challenge? It was predicated on the same analysis, but I believe the Board heard you in that analysis. Well, I understand, but it's really one essential contention that the Board was wrong in saying that the way the piles were set up in the first instance was not only a breach of the contract obligation, but two, was one which the government was entitled to insist on a complete redo. But if we agree with you on that, you win both of the two parts of the case, right? And if we don't agree with you on that, you lose both, right? I tend to agree with that analysis, Your Honor, but the suspension of work is based on a different set of facts and a different set of circumstances. One could see that the suspension of work was proper, but the directive to remove and replace was improper. Suspension in order to give time to assess whether there was a problem that was sufficiently grave to require a complete redo, and then that would... And that's why I want to separate them, and I first want to look at the decision by the Board to deny Mufferno's claim relating to the removal and driving of the sheet piles. Before I do, I do want to point out four significant facts, and these facts are not disputed facts, and these facts are not contrary to the Board's finding. The first fact is that Muffern Miller entered into a contract with the government to install steel sheet pile bulkhead consisting of 349 interlocking sheet piles. These are steel sheet piles. Muffern Miller installed 341 sheet piles before the government directed Muffern Miller to suspend work because of certain misalignment of the steel sheet piles that were installed. The as-installed sheet piles with this project, the strength of the as-installed sheet piles was greater than the design strength. I'll explain the reason being. Mr. Oxley, shouldn't you be telling us why the decision of the Board below lacked substantial evidence? The case seems to be thoroughly fact-driven, and there were findings here. There were conclusions that safety was at issue, that there was an inadequate safety factor. Specifications would have yielded a safety factor of 181%, and yours were from 144 to 154. Where is there a lack of substantial evidence in the Board's opinion? There was a lack of substantial evidence because what the Board failed to recognize was what this original sheet pile was designed for. This sheet pile was designed for utilizing grade 38 steel sheet piles, which yielded a yield strength of 38,500 psi. The contract required a grade 50, which was in theory 50,000 psi. What was installed did not strictly comply with the contract because it was a reduction of strength when comparing it to the contract requirement. But what was installed was still greater than what was designed for this project because of the utilization of the grade 50 steel sheet piles. You're saying the specifications weren't met, but that was justified. That is true. Muffer-Miller does concede that it did not strictly comply with the contract requirements here. But there is an exception. I'm having trouble, and let me bring your attention back to the point that Judge Lurie raised in his question because it's a point of confusion for me, at least. You're saying that the strength was actually greater than what you're calling the design strength of these bulkheads. But the board found that the safety factor, which they calculate out, was significantly less, the 181 versus the 144 to the 154. Clarify for me, if you will, what is wrong with the board's assessing safety factor as an important way of asking the question of whether the government got what it was expecting to get from the contract. Everybody, including the experts in this case, looked at the reduction in the safety factor because that was the easiest thing to look at in this instance. Well, isn't that an important thing to look at? It is an important thing, but what the board failed to realize is that even though there was a reduction in strength from what was required in the contract, and there was a reduction in the safety factor from what was required in the contract, the sheet pile, as installed, was still adequate for its intended purpose. The intended purpose was what it was designed for. It was designed for a certain strength. Don't you have to go by the specs, not by ultimate results? And if the specs weren't suitable, aren't there procedures for you to modify the specs rather than not to perform? When addressing the issue of whether there was substantial compliance, and substantial compliance is a very subjective standard, what is substantial compliance? Because Hufford & Miller provided a product that had a safety factor of 154, does that mean that because it wasn't 181, they did not substantially comply with the contract? It's very subjective. But I want to fall back to what I believe is where the board fell short, and that is analyzing whether or not the economic waste doctrine applies in this instance. And I believe the economic waste doctrine does apply because if you look at the critical elements of the application of the economic waste doctrine, the two critical elements are, was the as-installed product adequate for its intended purpose? And you have to look back at what it was designed for. And then number two, was the directed-to-remove-and-replace economically wasteful? The board failed to address these two criteria. It concluded that there was no substantial compliance in its analysis there. There is substantial evidence in this record to support that the as-installed sheet pile installation by Hufford & Miller was adequate for its intended purpose. And the basis of that is the fact that what was installed, the strength of what was installed, was greater than the design strength. Now, are you talking about the average strength across the entire bulkhead, or the strength of each, the minimum strength of the weakest link, so to speak? Because there's some confusion in the briefs between those two positions, and indeed in the record. That is correct. Which are you addressing? I am conceding that, I am assuming with my argument that the board's finding and the government's contention is correct. Take the weakest link. Take the weakest link. And Hufford & Miller contends that that is an improper analysis of it, because that's good in theory, but in actuality, no, you've got to look at the average, because the entire sheet pile wall is acting as one unit in the disclosure distributed amongst the entire wall, not one particular sheet pile. But even taking what the board's finding as being true, and what the government's contention as being true, with that analysis, taken at the weakest point, you would still have the as-installed sheet pile wall at the weakest point greater than the design strength. Now, what exactly is design strength that you keep referring to? What is that concept? That falls back to the fact that when this sheet pile wall, the bulkhead was designed, it was designed utilizing grade 38 steel, which had a yield strength of 38,500 psi. And that's the factor utilized in calculating what is the strength of a wall. Yield strength is the amount a certain sheet pile could be subjected to before failure. What was contracted for, there was a decision that, and I don't know what the decision was based on, but the decision was for the contract, and for the purposes of the contract, grade 50 steel would be utilized, which has a yield strength, in theory, of 50,000 psi. Now, the yield strength can vary depending on how the steel is milled and manufactured at the plant. But, at the time it was designed, it was only utilizing the 38,500 psi. And that design was never changed at the time it was contracted for. So, what was contracted, at the time it was contracted, was contracted harnesses far and above what it was designed for. And even though the installation was not in strict compliance with the contract, it still was greater than what the design was. And I want to fall back to the fact that, even though not in strict compliance with the contract, what was installed by Muffer and Miller was adequate for its intended purpose, which was one of the elements of the economic waste doctrine, because of the fact that the installation by Muffer and Miller was greater than what it was designed for. Okay. Thank you. We'll save the rest of your time. Does that make sense to you? I do want to get into the suspension of work claim. Okay. I'll just be very brief on this issue. The suspension of work, the board decided that the suspension of work was proper in this instance. It was reasonable. Muffer and Miller does not believe, and it's their argument, that the board erred in making this decision. And the decision is not based on the substantial evidence in the record for three reasons. The first reason is that the government issued the suspension of work after Muffer and Miller had installed all the sheet piles for this project. And they said nothing about misalignment until after all the sheet piles were installed. The suspension of work, there is substantial evidence in the record that the suspension of work by the contracting officer was based on an erroneous and overstated assessment by the government's engineer of the reduction in strength of the sheet piles that were installed by Muffer and Miller. The third reason is that Muffer and Miller provided a work plan to the government, and that work plan was rejected by the government. That work plan was the same work plan that was implemented by Muffer and Miller for the second installation of the sheet piles without the objection of the government. Okay. Thank you. Thank you, Mr. Rockson. Mr. Sneed. Good morning, Your Honor. The decision of the Armed Services Board for contract appeals should be affirmed because Muffer and Miller has failed to establish either that the factual findings are unsupported by substantial evidence or that the Board made any error of law. Muffer's, I'm sorry, the appellate's appeal here takes out of context and indeed stands on its head two important principles of law held in this court. First, that factual findings on appellate review, the appellate review of factual findings is extremely limited, and secondly, that in an express contract the government's entitled to insist that its contract specifications be fully met. On both these points, Muffer and Miller has it exactly backwards. Well, you don't really mean fully met, right? I mean, there is a doctrine of substantial compliance. I mean, you sort of, by saying fully met, you kind of finesse the whole issue in this case, which is that there's substantial compliance. Yeah, you're having to dodge it in the first place. That's absolutely correct. But it is important to recognize that full compliance, indeed if we want to be pedantic about it, literal compliance is the general rule and then an exception in this court, particularly the economic waste doctrine or the other substantial compliance cases has been recognized by this court. But those are exceptions to the general rule. By the way, since you've mentioned economic waste, let me just get something clear in my own mind at the outset. Is there in your view, and I think there may be a disagreement between the parties on this, but what is your view as the relationship between substantial compliance and economic waste as doctrines of contract compliance? As manifested in this case, I believe, and I think, that granted construction, this court's decision in granted construction, and subsequent board decisions, Valenzuela and Shirley contracting, which applied granted construction, both of which were affirmed by this court, albeit in summary affirmed, this is just the board applying granted construction, all held that substantial compliance, that is substantial compliance with the contract requirement, is an element that the contractor must show in order to advance the claim of economic waste. So they have to show that we did substantially comply. Then they secondly have to show that what the government required us to do, that is full compliance, was clearly disproportionate given that we had substantially complied. But that's their argument. That's their argument, is it not? That they met the minimum strength requirements even with the inadequate mesh between the segments. That is their argument. Even at the weakest link. That is their argument, Your Honor. And therefore requiring that it all be done over was a matter of economic waste. No, Your Honor, for several reasons, but first of which is, although that is their argument, the board on the findings of fact made by the board, which the contractor cannot challenge except on a showing of a lack of substantial evidence. The board used the same analysis which the contractors advanced, adjusted it for facts found as opposed to those assumed by the contractor's analysis, and concluded it did not meet the intent of the design. Now let's be clear about that because you were fencing a few minutes about that with Mr. Officer, so I'd like to change my planned remarks and address two things that he said. First of all, here's the way I would think of the spectrum of the compliance. There's literal compliance. There's a document that describes what they are required to do, and in the general rule we're entitled to insist on full and complete compliance with every requirement. What their case, what the substantial compliance component of economic waste is about is, okay, look, I know I didn't comply with that, and as they can see here, they did not comply with specifications, but I substantially complied. Let me persuade you, they say, as to why we complied. I'm going to do an analysis, and I'm going to show that what we delivered was as good as what you were contracting for, even though it didn't literally comply. And Mr. Pierce did that by saying, I looked at your design, I calculated that your design, your Corps of Engineers design, had a 180% degree of safety. That is, here's what I look at, I'm not an engineer, but here's the way I look at it, 100% is the standing necessary so the wall doesn't fall down. So there's not a catastrophic failure. So it actually does, in Mr. Officer's words, its intended purpose. But the government designed the wall to do more than hold back the mud and sludge. The government designed that wall to have a margin of safety, and it wanted that margin of safety, as the witnesses testified, for several reasons. It wanted it because the wall, as designed, was holding back a pile of sludge that was currently, you know, the land being used for some purpose. Years from now, that land may be used for another purpose. I believe at least a portion of this had a gravel road running next to it. Years from now, somebody may want to build an office building on top of that land, and so the Corps of Engineers wanted a margin of safety that they would be fudged on. They wanted durability. They wanted a 100% guarantee in case the materials ultimately weren't as high quality as they intended. But Mr. Officer... Please go ahead and finish. I'll finish at this point. That's fine, that's fine. Because I want to finish this contrast. The point that Mr. Officer is making today is when he said it was adequate for its intended purpose, I don't understand him to be saying that, in fact, it was 180% margin of safety. He's saying it's 100%. It's good enough to hold the wall back. And that's not the basis upon which his expert analysis was done, and it's not the basis upon which the case was tried. But he didn't say 100%. He said 140% or 145%.  I believe he's making that assertion because it's in excess of 100%, but it's not 181%. What is this design strength figure, and could you respond to his argument that they're basically using better steel than was provided for in the contract? That's not true. The contract did specify a specific grade of steel, and the steel that was delivered was exactly the grade that... What about the 50,000 PSI for grade... Again, I'm not an engineer. As opposed to the grade 38. I'm not an engineer, so here's how I've dumbed it down. The wall, the strength of the wall, in layman's terms, was really determined by two factors. It's determined by the strength of the steel, the cast of the steel. When does the piece of steel bend? That's measured in pounds per square inch. And it's determined by the geometric shape of the wall. The board's decision does a nice job of describing it. One witness, very aptly, I thought, described the wall's construction as though it were like a cowboy hat. There's some strength given the folds of the Z, but that when you install these piles at a greater than specified width, you'll cause the top of the wall to collapse a little bit, and it's not as strong. It's a geometric shape. I take it what your opposing counsel is arguing is that, yes, they may have given up some strength in terms of the way that the segments were linked and the distance between the segments, but they overcame that, what they gave up, by using stronger steel. At least that's what I took away from his theory. What his expert testified to was that the strength of the steel was higher than necessary because the steel specified in the contract should have been able to withstand 50,000 psi. When he looked at the records, which showed how this particular steel, it's the same grade, was actually cast, it showed a variability all in excess of 50,000 pounds, sometimes as high as 58,000 pounds. He averaged that all together. That's one of the components of the analysis that he did. The board judge credited his analysis, his methodology, but changed that one assumption because the records actually showed that there was detailed information. What the plaintiff's expert did was a straight line average. There are 13 batches of steel that made up these plates. For each batch of steel, there's two test numbers as to how strong it is, 57, 58, 59,000 psi. What the plaintiff's expert gave was just a simple straight line average. The 26 numbers divided by 26, they're the average strength of the steel, 55,000 and some odd pounds. What the board judge did was using the Eckert's own report, said, look, this steel, this report, actually shows that all of these batches, of 13 batches, had different numbers of steel plates manufactured in each one. For example, if you go to the plaintiff's report, the one with too much yarn, which is in the record, it contains, appendix page 33, it contains the actual test results for each batch of steel. If you see in the first batch, I'm on page 833, item number one, it's hard to read the print, I apologize. The first column, see the quantity number is eight, and the range of yield there is 56,000 to 57,000. You drop down to the next batch, well, there's 35 sheets there, but the range is only 55,000 to 56,000. All the board judge did was use his own analysis and say, you know what, you have to weight the average, because if you just blend them all together, you're attenuating the variability of that. So it should be a weighted average, not a straight line average. But they're all above, whatever the weakest link is, they're all above the standards set in the contract. No, they're not, Your Honor, that's exactly the point. First of all, to be clear, there's no standard set in the contract. The contract doesn't have a clause that says, build us a wall that has 181% margin of safety over our needs. The contract has a diagram, says build us this wall, make it out of this kind of steel, put it right here, put in 349 sheets. The only reason anybody even cares about a question of safety, margin of safety, or design intent, is because the contractor, in trying to make its case, is saying, I know I don't meet those specifications, but let me persuade you that what I did deliver is good enough, and here's how I'm going to persuade you. I'm going to show you that the margin of safety is the same that you bought, you contracted for. And what the board judge found is, it's not, the government wanted 181% margin of safety. What this contractor delivered, at best by their own admission, is 144. 144 versus 180 is about 50% reduction in the margin of safety above failure. What the contractor is saying today, I understand, is, okay, I can see all that. But you still should have accepted it, because it at least met the 100% standard. It's above 100%. It didn't fall down. That is not substantial compliance. That's not his argument either. I'll let him speak for himself here. I'll let him speak for himself. I will say this, that the board's decisions in Shirley Contracting and in Valenzuela do clearly hold, and I believe correctly hold, that the government is entitled to insist upon the durability, the longevity, the reduced maintenance aspects. And if it doesn't get that in the bargain, then it hasn't gotten what it is contracted for. In the time I have remaining, I'll just address two quick points, one of which Judge Ruhrig touched on to begin with, and that is to say that this court need not consider any of these issues unless a parliament can demonstrate that, in fact, the factual findings as made by the board are not supported by substantial evidence. It does not matter that there are other witnesses who have contrary opinions as to those which the board chose. The CDA decided, Congress, through the CDA, decided that the trial court would be the picker of facts. It decided that the trial court would have the primacy over factual matters, and that your review with factual matters was limited to determining whether or not there was substantial evidence. One thing that isn't really discussed, and I don't want to put you on the spot with the question, but it seems very strange that when the flaw in the construction, at least, has been made to be conspicuous, flagrant now at this stage, how did the entire wall get built before that was observed? Thank you, Your Honor, because that was the other point I did want to answer. During Mr. Officer's argument, he pointed out with respect to the question about suspension that they did install the whole wall and the government didn't do anything about it until after they had all the plates in. My first answer to that is, even if true, which it's not, but even if true, so what? It's a fixed-price contract. It is the contractor's obligation to achieve the contract specifications. In fact, this whole fight over the economic waste doctrine, this whole claim that we might owe them additional money because of government direction, occurred only because the government acted prudently and tried to stop the problem and get it corrected before it had gone too far. The government was fully entitled to this contract, to sit on its hands, do nothing, nothing, let them put the wall in, let them rip the wall out, and on final inspection say, you know what, it doesn't comply with the contract, we're sorry, do it over again. That's how it worked. I'm sorry? That's how it worked. They didn't stop the construction until it was over. That is not how it worked, Your Honor. In fact, the government issued a stop-work order, took corrective actions, they still had much work to do, I'm going to be clear, they had installed 349 piles. The contract required them to do all of the physical work. They had done 342, not 349. But, what's the facts? Why is Mr. Oxler wrong? Finding of fact number eight, the board specifically found, and I quote, M&M began its initial driving of new piles on February 16th, 2000, and completed it on March 31st, skipping over the sites. On February 16th, and again on February 21, and again on February 25, these being just one week after the contractor started, the government quality assurance representative, QAR, noted in his daily report that the alignment of the piles was not straight. And when you look into the record, when these matters were raised with the contractor, the contractor's reaction, as it was when it got the stop-work order, was, this is my problem to fix, and I'll make sure it complies with the requirements. So, in fact, it was open and obvious. In fact, the board found, without any doubt, in fact, the plaintiffs conceded, that they made no effort. They literally made no effort to accomplish the contract specifications when they first installed, and they never even tried to get them on 36-inch centers. And when they did pull them, and to be clear, the government did not ultimately require them to pull all 349 piles. The government's suggested cure was pull half of them, the worst ones, give us engineering analysis as to the other ones, and if we can accept that, we'll live with it. It was the contractor who elected to pull every pile, all 349 piles. And when they did do that, and they made the simplest effort of literally putting down a template and putting a mark every three feet, and ran the machine, lo and behold, they didn't get literal compliance, because the foot wall actually ran two feet long, but they did get in all 349 sheets, and they delivered the margin of safety that the government had contracted for. For these reasons, Your Honor, the decision of the Longstreet Board of Contract Appeals should be affirmed. Thank you, Mr. Sneed. Mr. Aksu. Thank you, Your Honor. Very briefly, I just wanted to clear a little bit of confusion about what was contemplated at the time of design. The opposing counsel mentioned that there was a 180% factor of safety built into the design. That's not true. Actually, the 180% factor of safety was built in at the time it was contracted for, because of the increased rate of steel, 38 to 50. At the time of the design, it did not contemplate a 180% factor of safety. That's where I want to make sure that I understand exactly where the parties are on that. When you say at the time it was contracted, that's the point at which the 180 or 181 safety margin was agreed upon. Is that fair to say? That's fair to say. At that point, the government was entitled, under the contract, to substantial compliance with 181%, even though it might be well in excess of anything that would, in practical terms, be needed over the life of the project. Correct? I agree with that, Your Honor. I am pointing this out on the basis of the application of the economic waste doctrine, because the application is based on whether the as-installed product was adequate for its intended use. Let me make sure I know exactly what you're saying on this. Suppose one could build a facility in Miami and say, you know what, the odds of a hurricane with winds more than 150 miles an hour are very low. Therefore, one could say, well, we'll figure that's the maximum that one needs to build into a building, a high-rise building, is to withstand 150 miles an hour wind. A person could enter a contract and say, no, you know what, we want you to build it to 250 miles an hour, because you never know when there'll be a once-in-three-centuries type of storm, and we don't want the building to come down. Now, wouldn't the contracting party be entitled to the extra 100 miles an hour protection, and wouldn't it not be economic waste if that party insisted on that protection even after the building was built, and it turned out it was only good to 150? I believe in that instance that the government, or whatever the contracting owner is at that time, would be entitled to that. However, you've got to factor in whether or not the removal and replacement would be economic waste. Ah, but are you saying that if they put in this extra margin of safety, and that the court or the board after the fact should look at that and say, eh, it really wasn't necessary? Well, at the time it was designed, it really wasn't necessary. But at the time of the contract, they contracted for that. Well, there's been no testimony or no evidence to establish that they increased the greatest deal because they wanted to increase the factor of safety. We have to go back and look at the record, but I believe the record is devoid of any of that information. I do want to point out one other thing, is the fact that public safety in the application of the Valenzuela case, that decision by the board was solely based on the fact that there was public safety at issue and that there's a potential catastrophic failure. There was never an issue here. Actually, there is testimony by the government's own witness saying that public safety was not an issue. We didn't have concerns about catastrophic failure. I want to point that out. And also, the fact that the inspection reports by the government's inspector, those were not provided to the contract until after the suspension of work. Okay. Thank you, Mr. Officer. Mr. Sneed, case is taken into submission.